| | |
|---|---|
| SPERRY ASSOCIATES FEDERAL CREDIT UNION,<br><br>    Plaintiff,<br><br>  -against-<br><br>CUMIS INSURANCE SOCIETY, INC.,<br><br>    Defendants. | **UNITED STATES DISTRICT COURT**<br>**FOR THE DISTRICT OF NEW JERSEY**<br><br><br><br>10-CV-00029-DRD-MAS |

**REPLY BRIEF AND MEMORANDUM OF LAW OF PLAINTIFF**
**SPERRY ASSOCIATES FEDERAL CREDIT UNION IN FURTHER SUPPORT**
**OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

                       Loanzon Sheikh, LLC
                       Local Counsel for Plaintiff,
                       Sperry Associates Federal Credit Union
                       Umar A. Sheikh, Esq.
                       197 State Highway 18
                       PMB 4175, Suite 3000
                       East Brunswick, New Jersey 08816
                       (732) 398-8600

                         -and-

                       Scott A. Rosenberg, P.C.
                       Counsel for Plaintiff,
                       Sperry Associates Federal Credit Union
                       By: Scott A. Rosenberg, Esq., (P*ro Hac Vice*)
                       Kenneth J. Pagliughi, Esq., (*Pro Hac Vice*)
                       2400 Jericho Turnpike
                       Suite 210
  Motion Return Date:        Garden City Park, New York 11040
                       (516) 877-7205

  Tuesday, February 21, 2012

## Table of Contents

**PRELIMINARY STATEMENT** ............................................................................................... 3

**ARGUMENT** ............................................................................................................................. 6

    **I. CU NATIONAL WAS PERFORMING THE FUNCTIONS OF A "SERVICING CONTRACTOR" AS DEFINED BY THE BOND AT THE TIME OF LOSS.** ........................... 6

        **A.**   **Servicing Contractor** ............................................................................................... 6

        **B.**   **The Notes** .................................................................................................................. 7

        **C.**   **North Jersey Savings and Loan Association** ........................................................ 7

        **D.**   **The Assignments** ..................................................................................................... 9

    **II.**    **SPERRY'S LOSS IS SUPPORTED BY THE FACTS** ............................................. 10

        **A.**   **Sperry Suffered its Loss at the Time of Conversion** ......................................... 10

        **B.**   **Monthly Remittances and Trial Balance Statements** ....................................... 10

    **III.**   **OTHER BASES UNDER WHICH CU NATIONAL AND MCGRATH COULD BE DEEMED AN EMPLOYEE UNDER THE BOND** ................................................... 11

    **IV.**   **SPERRY HAS SUFFERED A DIRECT LOSS** ......................................................... 12

    **V.**    **MCGRATH ACTED WITH MANIFEST INTENT TO CAUSE SPERRY A LOSS** ............ 13

**CONCLUSION** ....................................................................................................................... 15

## PRELIMINARY STATEMENT

Sperry Federal Credit Union ("Sperry") submits this reply brief in further support of its motion for partial summary judgment against defendant CUMIS Insurance Society, Inc. ("CUMIS") as to liability on the First Count of its Amended Complaint filed in this Action (the "Complaint") for declaratory relief under a bond form issued by CUMIS to Sperry (the "Bond"), declaring that CU National and Michael McGrath ("McGrath") are employees as defined by the Bond, that Sperry has suffered quantifiable losses covered by the Bond resulting from the acts of CU National and McGrath, and that CUMIS has a duty to indemnify Sperry for its losses under Coverage Part A of the Bond.

In its moving brief, Sperry established a *prima facie* case that Sperry is entitled to coverage under its Bond. It demonstrated that CU National was the servicer of Sperry loans (i.e. CU National as servicer, collected and recorded the borrowers' monthly payments), a point which CUMIS seemingly concedes in its opposition. Sperry has also demonstrated that it was not coincidental that CU National was servicing the Sperry loans at the time of the loss but rather the loss occurred when CU National was in the act of servicing. Finally, it has been demonstrated that Sperry had an actual loss and McGrath acted with the manifest intent to cause that loss.

In its opposition brief CUMIS states that "Since the dishonesty undeniably occurred in the selling of loans on the secondary market, there is no coverage…" and relying on <u>North Jersey Savings and Loan Association v. Fidelity and Deposit Co. of Maryland</u>, 283 N.J. Super. 56 (Law Div. 1993), argues that Sperry's position (which CUMIS misstates) is wrong as coverage for servicing contractors only applies when the loss occurs when the servicing contractor is in the act of servicing the loans. Sperry's position is that its loss occurred while CU National was performing the services, enumerated in the servicing contractor definition. What is undeniable is that Sperry suffered its loss at the time McGrath (a CU National employee) stole the loans from Sperry's servicing portfolio by giving US Mortgage physical possession of the Notes and assigning the loans to US Mortgage. CU National was

3

not acting as an originator or secondary market seller (which undisputedly it was not) at the time of loss, it was charged with one responsibility to collect and record borrower mortgage payments, in other words it was servicing the Sperry loans and in the act of servicing Sperry's loans when they were stolen.

CUMIS ignores the fact that the fraud involving the notes is inextricably linked to the collection process. Under NY UCC § 304 a note contains the sum certain to be payable at a definite time. In other words, the note directs the amount to be collected and the time for that collection. It is undisputed that CU National was collecting payments pursuant to and based on the directives of the notes. A holder or its agent must be in possession of the note in order to collect on it; the note is part of the collection process. Therefore, when CU National delivered physical possession of the notes and assigned[1] the very notes it was collecting upon to US Mortgage, it was clearly acting in the role of "servicing contractor," as the notes direct and are part of the collection process.

CUMIS also argues that Sperry cannot demonstrate that the servicing reports prepared by CU National were false. CUMIS's position is just illogical. Sperry has produced in its motion copies of the notes and mortgages which clearly indicate the date that they were assigned to US Mortgage. Sperry has also produced reports showing that the loans remained in Sperry's servicing portfolio in spite of the fact that they had been assigned to US Mortgage. Clearly if the loans had been assigned to a third party Sperry was no longer the owner of the loans, ergo, any subsequent reports Sperry received showing they still owned the loans had to be fraudulent. To underscore how much sense Sperry's position makes as to the false reporting it should be noted that at the deposition of CUMIS's own adjuster he seemed to agree with Sperry on this point, testifying that McGrath had to create accounting records for the credit unions that showed they still owned the loans after they were stolen.

---

[1] In its moving brief at page 19 Sperry errantly refers to CU National having sold the loans, the loans were never sold by CU National they were assigned by CU National to US Mortgage and by US Mortgage to Fannie Mae.

CUMIS also asserts that Sperry has not suffered a direct loss under the policy as there was pending litigation between Sperry and Fannie Mae over the ownership of the Mortgages based on Uniform Commercial Code "Holder" law. Whether or not there is a third party from which there may be a potential recovery has no bearing on whether or not a loss has been sustained. There is nothing in the Bond that requires that the insured pursue recovery from third parties before a loss is covered. CUMIS's position is that Sperry has not suffered a loss until ownership of the loans is decided; or if the matter is settled (which it has been) that Sperry did not suffer a direct loss as the loss was a result of litigation. Such a position is ludicrous, if one were to extend CUMIS's logic to every loss where the insured has identified a party from which there may be a recovery, coverage under the Bond would be illusory.

Lastly, CUMIS recognizing its argument that the loss occurred from the sale of loans and not the assignment while the loans were being serviced by CU National is weak, asserts for the first time that even if CU National was a "servicing contractor" as defined by the Bond, there would still be no coverage for Sperry's loss as McGrath failed to act with manifest intent to cause Sperry to suffer a loss; or alternatively that such a question is one of fact that cannot be decided at summary judgment. Again, such an argument is illogical. As between the two parties Sperry and Fannie Mae it is Fannie Mae that received the stolen property from McGrath while Sperry received nothing[2] for its stolen property. It is clear that McGrath intended to cause a loss to the credit unions as evidenced by his conviction. As Sperry was a victim of the same scheme it is just as clear that McGrath intended to cause a loss to Sperry.

---

[2] The only thing Sperry received was at most a few payments on the loans which McGrath had CU National make in order to conceal the theft. After the fraud was discovered Sperry was the only party as between Sperry and Fannie Mae that lost anything.

5

## ARGUMENT

**I.  CU NATIONAL WAS PERFORMING THE FUNCTIONS OF A "SERVICING CONTRACTOR" AS DEFINED BY THE BOND AT THE TIME OF LOSS**

**A.  Servicing Contractor**

Under Insuring Agreement A of the Bond the definition of "employee" includes "servicing contractors." The term "servicing contractor" is defined as:

> "Servicing contractor" means any person or entity duly authorized by you to perform any of the following services and only while performing such services:
>
> a. Collect and record payments on real estate mortgage or home improvement loans; or…

As respects the Mortgages held in the Sperry portfolio, CU National, per the terms of the servicing agreement, was retained to collect and record monthly mortgage payments received from credit union members and were doing so at the time the theft of the Notes and Mortgages occurred. *See*, Clark Affidavit submitted in support of Sperry motion for summary judgment Exhibits "F" and "G," evidencing that CU National was collecting payments from the borrowers at the time of the theft.

It is clear under CUMIS's own analysis CU National was Sperry's "loan servicer." It is undisputed that the loans were assigned to US Mortgage and US Mortgage was fraudulently given physical possession of the Notes while CU National was servicing the loans (collecting and recording payments pursuant to the requirements of the note and the mortgages). The sale of loans to Fannie Mae did not cause Sperry's loss but was simply the vehicle through which McGrath profited from his scheme. CUMIS consistently ignores this point. Based on CUMIS's own admission that CU National was Sperry's loan servicer and the fact that the theft of the loans occurred while CU National was collecting and recording payments, Sperry's loss falls squarely within Insuring Agreement A of the Bond.

**B.**     **The Notes**

CUMIS argues that Sperry's loss occurred when Sperry's loans were sold to Fannie Mae. That argument is factually and as a matter of law incorrect. The notes are in fact negotiable instruments under NY UCC § 3-104 and transfer of ownership of the note occurs by the assignment or delivery. Here the loss occurred when CU National assigned and delivered the note to US Mortgage and Sperry lost its ownership interest in the notes.

The notes are inextricably linked to and are part of the act of collection. Under NY UCC § 304 a note contains the sum certain to be payable at a definite time. In other words, the note directs the amount to be collected and the time for that collection. *See,* IndyMac Bank F.S.B. v. Yano-Horoski, 2009 NY Slip Op 29491, 6 (N.Y. Sup. Ct. 2009) (In finding that the note evidences indebtedness.) In order to enforce a note a party must be a holder or owner of the note (or agent of the owner) Emigrant Mtge. Co., Inc. v Fitzpatrick, 29 Misc. 3d 746, 750 (N.Y. Sup. Ct. 2010). It is the note that perfects the right to payment. *See*, Provident Bank v. Cmty. Home Mortg. Corp., 498 F. Supp. 2d 558 (E.D.N.Y. 2007). It is undisputed that CU National was collecting payments pursuant to and based on the directives of the notes. Therefore, when CU National assigned and delivered the very notes it was collecting upon to US Mortgage, it was clearly acting in the role of "servicing contractor," as the notes are part of and direct the collection process. As CU National was performing the services enumerated in the "servicing contractor" definition at the time of loss, then it and all of its employees and directors are "employees" under Insuring Agreement A of the Bond.

**C.**     **North Jersey Savings and Loan Association**

CUMIS, argues that Sperry asserts that once a party has engaged in the services enumerated in the "servicing contractor" definition of the Bond, that party is a covered "employee" for all losses that result from that party's conduct. This is not what Sperry argues, Sperry's position is that its loss

occurred while CU National was performing the services, enumerated in the "servicing contractor" definition, as illustrated above. As the court noted in North Jersey,

> North Jersey alleges that Landbank's fraud and dishonesty are reflected in its inflated mortgage appraisals, its insider loans designed to disguise its own speculative ventures, its violations of state and federal statutes in obtaining the mortgages, its submission of fraudulent service reports to conceal the extent of defaults on its loans, its failure to notify North Jersey of foreclosures by other lienors on mortgaged property, its concealing the fact that Insurance Exchange of the Americas' policies of insurance were worthless, and its failure to remit collections of mortgage payments to North Jersey.

The court in North Jersey rightly recognized that the alleged fraud as respects loan origination did not occur when Landbank was engaged in the collection or recording of borrowers' payments and therefore found that Landbank was not a servicing contractor as defined by the bond in that case. Here however the facts are much different. As illustrated above CU National was engaged in the collection and recording of borrowers payments pursuant to the notes when McGrath assigned and delivered the loans to US Mortgage. McGrath's theft occurred when CU National was performing such services.

CUMIS's argument that coverage is limited to theft of monies while collecting loan payments is flawed. Insuring Agreement A of the Bond provides coverage for loss by the dishonest acts committed by an "..employee" or "director," acting alone or in collusion with others…" and that covered property is defined in part as "original mortgages, documents of title, evidence of debt, security agreements, money orders, certificates of deposit or "certificated securities." There is no limitation within the policy that limits a loss to monies as CUMIS suggests. Under a fidelity crime bond, loss means "the deprivation or dispossession of money or property of the [insured] due to the dishonest, criminal or fraudulent acts" of the insured's employees. Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc., 249 F. Supp. 2d 19, 27 (D. Mass. 2003) (citing Fitchburg Sav. Bank v.

8

Massachusetts Bonding & Ins. Co., 274 Mass. 135 (Mass. 1931)). In order to trigger coverage, the assets of the insured must be diminished as a result of the dishonest act of the insured's employee. Fireman's Fund Ins. Co. (citing Continental Casualty Co. v. First Nat'l Bank, 116 F.2d 885 (5th Cir. Tex. 1941)). As Sperry lost its status as obligee/mortgagee of the Mortgages each time McGrath assigned and delivered the Notes and Mortgages out of the Sperry portfolio Sperry clearly experienced a diminishment of its assets. McGrath's theft of the notes from CU National is no different than his stealing funds directly from the Sperry servicing account.

D.     The Assignments

CUMIS argues that it was coincidental that CU National was servicing the loans at the time McGrath through US Mortgage sold the loans and therefore there can be no coverage for CU National or McGrath as a "servicing contractor." Again CUMIS ignores the fact that Sperry's loss occurred each time McGrath assigned the Mortgages out of the Sperry servicing portfolio and Sperry lost its status as obligee/mortgagee of the Mortgages.

CUMIS's own example which misstates the facts, when restated clearly makes Sperry's point. CUMIS in its opposition states: "Sperry nevertheless argues that as long as CU National was servicing loans in building A at the same time US Mortgage committed unauthorized sales in building B, the Bond provides coverage." What Sperry is arguing is that the loan documents were stolen in building A (CU National's offices) where the loan documents were held and while CU National was performing the acts of servicing (collecting and recording borrower payments), by a CU National employee (McGrath). There is nothing coincidental about CU National's servicing and the loss. As demonstrated above the note is integral to the servicing function as possession of the note perfects a right to payment and CU National was collecting and recording payments pursuant to the notes. *See*, Provident Bank**.** The only coincidence here is that McGrath used CU National's sister firm, US Mortgage, as a fence to sell the negotiable instruments he had already stolen.

## II. SPERRY'S LOSS IS SUPPORTED BY THE FACTS

### A. Sperry Suffered its Loss at the Time of Conversion

As discussed above each time McGrath assigned the loan documents out of the Sperry servicing portfolio a new obligee/mortgagee was created, and Sperry lost its status as obligee/mortgagee of the loans. The delivery and/or assignment perfected US Mortgages security interest in the loans as provided by NYS UCC Article 9. *See*, Provident. As a matter of law Sperry lost its ownership interest in the loans at the time the loans were delivered and assigned to US Mortgage and not when they were sold to Fannie Mae. When the assignment was made, Sperry's loss of its property occurred.

### B. Monthly Remittances and Trial Balance Statements

CUMIS continues to argue that Sperry suffered no loss at the time of the assignment as Sperry continued to receive monthly remittances for the stolen Mortgages as evidenced by the statements it received by CU National. This is simply not the case, as demonstrated above Sperry had already lost its status as obligee/mortgagee under the Mortgages. As Sperry has previously pointed out, the monthly remittances and trial balances that Sperry received did two things, they concealed the dishonest acts of CU National/McGrath and to the benefit of CUMIS, reduced Sperry's loss by the principal credited to each Mortgage between the time it was stolen and when CU National finally stopped remitting payments on the Mortgages.

CUMIS continues to insist that Sperry has not provided any competent evidence that it has received fraudulent servicing reports. This is not true and CUMIS's position is illogical. Sperry has produced in discovery copies of the allonges to the notes and the assignment of mortgages which clearly indicate the date that they were assigned to US Mortgage. Sperry has also produced reports fraudulently showing that the loans remained in Sperry's servicing portfolio in spite of the fact that

10

they had been assigned to US Mortgage. Clearly if the loans had been assigned to a third party Sperry was no longer the owner of the loans, any subsequent reports Sperry received showing they still owned the loans had to be fraudulent. In a deposition in a related case[3] CUMIS's adjuster David Lynett[4] stated: "I know he [McGrath] was creating monthly summaries that would be provided for. In other words he had to do a two-track. Once Fannie owned a loan they weren't supposed to own, he had to do an accounting record for both Fannie and the Credit Union." *See*, Deposition of David Lynett, annexed to the Pagliughi Declaration as Exhibit "A." Mr. Lynett's statement makes it clear, once a credit union including Sperry no longer owned a loan McGrath would have to create an accounting to reflect that they still owned it. Under all of these circumstances, for CUMIS to continue to insist that the statements issued after the loans had been assigned to US Mortgage were not false is disingenuous. The facts fully support Sperry's contention that the servicing reports Sperry received were fraudulent.

### III. OTHER BASES UNDER WHICH CU NATIONAL AND MCGRATH COULD BE DEEMED AN EMPLOYEE UNDER THE BOND

CUMIS misunderstands and mischaracterizes Sperry's analysis of the other possible bases under which CU National and McGrath could be considered an employee under the Bond. This was not done as a concession that its coverage position under the Bond is weak. In fact as CUMIS consistently ignores the fact that Sperry's loss occurred at the time of the assignments when CU National was acting as a "servicing contractor" as defined by the Bond, Sperry feels extremely confident about its position. Nor was this an implied attempt to seek leave to amend its answer. Rather this analysis illustrates CUMIS's overall handling of and approach to this claim. Rather than articulate in a disclaimer letter any and all reasons why coverage would not apply, CUMIS chose to litigate

---

[3] *Suffolk Federal Credit Union v. CUMIS Insurance Society*, U.S. District Court for the Eastern District of New York, No. 10-cv-0001-ads-etb.
[4] Mr. Lynett was also the adjuster of the Sperry claims.

11

coverage allowing it to develop its own amorphous theories as to the coverage. In any event there is only one issue that needs to be decided, and that is are CU National and McGrath "employees" of Sperry within the "servicing contractor" definition of the Bond. Sperry has demonstrated conclusively that they are.

## IV.     SPERRY HAS SUFFERED A DIRECT LOSS

Sperry has settled its dispute with Fannie Mae as to ownership of the loans. CUMIS cites Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co., 246 A.D.2d 202 (N.Y. App. Div. 1st Dept. 1998) and Vons Cos. v. Federal Ins. Co., 212 F.3d 489 (9th Cir. Cal. 2000) for the proposition that Sperry's loss is not covered as a settlement reached in litigation with third parties does not constitute a "direct loss" under the Bond. What CUMIS fails to note is that in both of these cases the losses claimed were third party claims against the insured. In Aetna Cas. & Sur. Co. the insurer sought a declaration that they were not obligated to indemnify defendant insureds under the terms of numerous fidelity bonds, as the defendant securities brokerage firm was not covered under the fidelity bonds for third-party claims arising out of the misconduct of its employee in divulging confidential information relating to corporate takeovers and mergers of the defendant's clients, which resulted in massive insider trading and losses to third parties. In Vons Cos. the court held, while the policy covered direct losses to plaintiff caused by its employee's dishonesty, such coverage did not extend to vicarious liability for losses suffered by others arising from its employee's tortious conduct. Neither case is on point or has facts analogous to this matter. Sperry's claim is for first party coverage under the Bond. The fact remains, Sperry's direct loss was at the time its loans were assigned to US Mortgage.

CUMIS's position as to mitigation of the loss falters because again CUMIS fails to recognize that Sperry's loss occurred at the point of delivery of the notes and/or assignment. The fact there is a third party from which there may be potential recovery has no bearing on whether or not a loss has

been sustained. Sperry has sustained its loss and its recovery from Fannie Mae mitigated the loss. Having engaged in the litigation with Fannie Mae Sperry reduced it loss under the policy, as this was an excess of limits claim, Sperry actually reduced CUMIS's exposure as its settlement with Fannie Mae has brought its total claim under the policy limit. If Sperry simply made its claim and allowed CUMIS to subrogate[5], Sperry would have been entitled to its excess loss prior to the distribution of subrogation proceeds to CUMIS, potentially leaving CUMIS responsible for the whole claim while not recovering anything.

## V.   MCGRATH ACTED WITH MANIFEST INTENT TO CAUSE SPERRY A LOSS

CUMIS, conceding the weakness of its coverage position now for the first time argues that Sperry has failed to establish that McGrath acted with the requisite manifest intent to cause a loss to Sperry. Alternatively, in a strained attempt to create a question of fact CUMIS argues that the question of McGrath's "manifest intent" is one for a jury to decide and that it cannot be determined as a matter of law at the summary judgment stage.

CUMIS is wrong on both counts. First, although McGrath was not charged with or convicted of stealing Sperry loans, he was charged and pleaded guilty to stealing the loans of the all the credit unions under the same scheme which Sperry suffered its loss. It is ludicrous to argue that he acted with any less of an intent to cause a loss to Sperry than when he caused the loss to the other credit unions. Moreover, the fact that he continued to make monthly payments to Sperry is just another example of his intent to cause Sperry a loss as the payments were only made to conceal the theft from Sperry. Actions that will possibly result in the benefit of the employer do not, as a matter of law, establish manifest intent. Evidence that the employee acted recklessly can be a manifestation of the employee's intent to cause the insured a loss. Finally, manifest intent does not require that the

---

[5] CUMIS has in fact already agreed to waive its right of subrogation against Fannie Mae.

employee actively wish for or desire a particular result, but can exist when a particular result is substantially certain to follow from the employee's conduct. FDIC v. National Union Fire Ins. Co., 205 F.3d 66, 74 (2nd Cir. N.Y. 2000). It is clear that Sperry's loss was certain to follow from McGrath's conduct, just as the court in FDIC found National Union's attempt to create a genuine dispute as to the manifest intent element of coverage is unavailing, this court should disregard CUMIS's argument as the facts of McGrath's acts and the substantial certainty that McGrath's acts would cause Sperry to suffer a loss evidence McGrath's manifest intent as a matter of law.

CUMIS rightly identifies that the subject cases cited by Plaintiff for the rule for determining manifest intent apply in embezzlement and embezzlement – type cases.  Whether or nor not the court need look at the subjective intent of the actor is weighed on a continuum. An embezzler, at one end of the continuum, necessarily intends to cause the employer the loss, since the employee's gains are directly at the employer's expense. FDIC quoting, First National Bank of Louisville v. Lustig [Lustig I], 961 F.2d 1162 (5th Cir. 1992). At the other end of the continuum, not triggering fidelity coverage, is the situation where the employee's dishonesty at the expense of a third-party is intended to benefit the employer, since the employee's gain results from the employer's gain. Under such circumstances, even if the employer suffers a loss, fidelity coverage is not triggered. FDIC quoting, Municipal Securities v. Insurance Co. of N.A., 829 F.2d 7 (6th Cir. 1987). Only occasionally, does intent with regard to the employer's loss present a factual issue. Where an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment, intent becomes a question of fact which will generally not be subject to summary judgment. Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co., 676 N.Y.S.2d 559 (N.Y. App. Div. 1st Dept 1998). It is clear that McGrath's conduct in stealing the Sperry notes is an act of embezzlement-type nature. His conduct was nowhere near simple poor judgment but was intentional and was certain to cause loss to Sperry. Therefore, this

Court can as a matter of law find that McGrath acted with the requisite manifest intent to cause Sperry to sustain a loss.

## CONCLUSION

As Sperry has stated before this is a simple matter regardless of how CUMIS tries to bend and twist the facts to fit its coverage position. The only issue truly in question is whether or not CU National and McGrath were "employees" covered under the Bond. Sperry has demonstrated that based on the plain language definitions of "employee" and "servicing contractor" in the Bond, CU National its partners, officers and employees including McGrath were an "employee" of Sperry for purposes of coverage under the Bond.

Sperry has also demonstrated that CU National/McGrath had a manifest intent to cause a loss to Sperry, and to obtain a benefit for themselves, or another entity, and the Loss resulted directly from CU National/McGrath's conduct.

For the foregoing reasons, Sperry respectfully requests that this Court grant Sperry's motion for partial summary judgment against CUMIS.

Dated: Garden City Park, New York
February 9, 2012

                 Loanzon Sheikh, LLC
                 Local Counsel for Plaintiff

                 /s/ Umar Sheikh
                 UMAR SHEIKH

                 Loanzon Sheikh, LLC
                 Local Counsel for Plaintiff,
              Umar A. Sheikh, Esq.
                 197 State Highway 18,PMB 4175, Suite 3000
                 East Brunswick, New Jersey 08816
                 (732) 398-8600
                 -and-
                 Scott A. Rosenberg, P.C.
                 Counsel for Plaintiff,
                 Sperry Associates Federal Credit Union
                 Scott A. Rosenberg, Esq., (*Pro Hac Vice*)

Kenneth J. Pagliughi, Esq., (*Pro Hac Vice*)
2400 Jericho Turnpike, ~~n~~Suite 201
Garden City Park, New York 11040
(516) 877-7205