**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SPERRY ASSOCIATES FEDERAL CREDIT UNION, | |
| Plaintiff, | Civ. No. 10-00029 (DRD) |
| v. | **O P I N I O N** |
| CUMIS INSURANCE SOCIETY, INC., | |
| Defendants. | |

*Appearances by:*

LOANZON SHEIKH LLC
by: Umar Sheikh, Esq.
197 Route 18 South
PMB 4175, Suite 3000
East Brunswick, NJ 08816

SCOTT A. ROSENBERG, P.C.
by: Scott A. Rosenberg, Esq.
Kenneth J. Pagliughi, Esq.
2400 Jericho Turnpike
Suite 210
Garden City Park, NY 11040

    *Attorneys for Plaintiff,*

SEDGWICK DETERT MORAN & ARNOLD LLP
by: Arthur H. Aizley, Esq.
Michael R. Davisson, Esq.
125 Broad Street
New York, NY 10004

Michael R. Davisson (*Pro Hac Vice*)
Valerie Rojas (*Pro Hac Vice*)

801 S. Figueroa Street, 19th Floor
Los Angeles, CA 90017

     *Attorneys for Defendant.*

**DEBEVOISE, Senior District Judge**

     This case arises out of a claim for coverage under an insurance bond, brought by an insured credit union for fraud committed upon it by third parties in a mortgage scheme.  Plaintiff, Sperry Associates Federal Credit Union ("Sperry"), seeks declaratory relief for coverage under the terms of the insurance bond.  Defendant, Cumis Insurance Society, Inc. ("Cumis"), seeks dismissal of Sperry's four causes of action asserted in its Amended Complaint, and dismissal of the entire action, with prejudice, as a matter of law.

     Presently before the Court are a Motion for Partial Summary Judgment filed by Sperry, and a Motion for Summary Judgment or, in the alternative, Partial Summary Judgment, filed by Cumis.  For the reasons set forth below, Sperry's Motion is GRANTED and Cumis's Motion is DENIED.

## I.  BACKGROUND

     Sperry is a New York based credit union that purchased a fidelity bond ("the Bond") from Cumis, a private shareholder-owned corporation incorporated and with its principal place of business in the State of Wisconsin.  The Bond has an effective date of July 6, 2008 and represents the renewal of an annual policy that is continuous until cancelled.  At issue is the breadth of coverage of the Bond over losses related to a fraud committed upon Sperry by two related corporations: CU National Mortgage, LLC ("CUN"), and its wholly-owned parent corporation, U.S. Mortgage Corp ("USM," collectively, "CUN/USM").  CUN is a New Jersey limited liability company formed for the purpose of providing mortgage servicing and origination services to the credit union industry.  USM is a New Jersey corporation and a

residential mortgage lender and loan servicer.  Michael McGrath, Jr. ("McGrath") was the President of both the subsidiary CUN and its parent company USM.

**Fraud by Third-Party Actors**

On September 5, 2006, Sperry and CUN entered into a Mortgage Full Services Agreement ("Full Services Agreement"). (Pl. MSJ. Br. Clark Ex. A).  Sperry did not have a contract with USM.  Pursuant to the Full Services Agreement, CUN would provide servicing of Sperry mortgage loans, which entailed collecting mortgage payments from borrowers, remitting tax and insurance, maintaining records of payments and balances with respect to each loan serviced, and providing monthly reports and remittances for serviced loans.  Under the Agreement, CUN agreed to assist Sperry if it desired to sell its mortgage loans to the secondary market.  The Agreement, however, did not authorize CUN or its parent, USM, to indorse, assign, transfer or sell any promissory note or mortgage without the direction or consent of Sperry.  Specifically, Section II. Para. Q of the Full Services Agreement details that CUN will perform loan production support services to "[f]acilitate the sale to the secondary market, when possible, of Mortgage Loans that the Credit Union cannot or does not wish to maintain in its portfolio." (Pl. MSJ. Br. Ex. O).

CUN/USM ran a fraudulent scheme in which CUN contracted with credit unions that owned mortgages, such as Sperry, and then turned around and assigned these mortgages without authorization to USM, which in turn sold them to the Federal National Mortgage Association ("FNMA").  On February 24, 2011, McGrath plead guilty and was convicted of crimes related to the fraudulent loan sales from January, 2004 thru January 28, 2009:  conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering.  As a part of that scheme, CUN/USM fraudulently sold twenty-seven mortgages that Sperry owned ("Subject Mortgages"),

valued at approximately $9.49 million, to FNMA without Sperry's knowledge or authority. To conceal the theft of the mortgage loans from Sperry, CUN/USM continued to act as servicer of the loans then held by FNMA. When it received the borrowers' payments to Sperry it transferred the funds to a clearing account and remitted them to FNMA. Then a comparable payment was made to Sperry by transferring funds from a CUN/USM operating account. In addition McGrath through CUN would provide trial balance reports which reflected the loans that remained in Sperry's portfolio, tying in to the remittances being forwarded to Sperry from the operating account. Thus, after the sale, CUN/USM continued to submit to Sperry monthly detail reports and summaries which indicated that Sperry still owned and was receiving regularly monthly income from the twenty-seven Subject Mortgages which had in actuality been sold off. Sperry continued to receive monthly payments until January 2009 from CUN for the Subject Mortgages which were sold to FNMA.

**The Tolling Agreement & the Wisconsin Case**

In February 2009, federal officials raided CUN/USM's offices, and CUN/USM filed for bankruptcy. The Bond that Cumis issued to Sperry was substantially identical to the "Cumis Form 500 Bond" issued to each of 26 credit unions who claim to have also been defrauded by CUN/USM's scheme. On or about February 13, 2009, Sperry sent notice to Cumis that it had experienced losses resulting from the acts of CUN/USM employees. On or about September 11, 2009, Sperry provided Cumis with a signed Proof of Loss identifying the 27 loans that were sold to FNMA without authorization.

The parties entered into a tolling and standstill agreement (the "Tolling Agreement") on or about September 26, 2009, in which Cumis agreed not to investigate the claim asserted by Sperry, and the parties mutually agreed to take no further action in pursuing or adjudicating

4

coverage for Sperry's claimed losses until December 31, 2009.  When they entered into the agreement, Cumis did not inform Sperry that on August 31, 2009, it had filed an action in Wisconsin state court (the "Wisconsin case") seeking a declaration that Cumis had no duty under the Cumis Form 500 Bonds to indemnify any of the 26 credit unions that had been defrauded by CUN/USM.  Rather, Cumis represented to Sperry that it would stay its investigation of the Losses so that Sperry could focus its efforts on an action against FNMA (the "FNMA Action") and resolve the issue of ownership of the Subject Mortgages.

Sperry did not learn of the Wisconsin case until November 17, 2009, when Cumis's general counsel informed Sperry's attorney that the action naming Sperry as a defendant had been filed.  Cumis's general counsel requested that Sperry waive the Tolling Agreement and consent to service in the Wisconsin case.  Sperry never consented to waiving its rights under the Tolling Agreement and Cumis never served Sperry in the Wisconsin case, thus Sperry was not a named defendant.  The Wisconsin case was removed to the United States District Court for the Western District of Wisconsin on December 17, 2009.

**Prior Proceedings**

On January 4, 2010, the first business day after the Tolling Agreement expired, Cumis served Sperry in the Wisconsin case.  Sperry filed the present action in this Court on January 5, 2010, although it was prepared to file the day prior, but for a delay with electronic filing.  On February 16, 2010, Cumis filed in this Court a Motion to Dismiss on abstention grounds based upon the "First to File" Rule.  However due to a stipulation of the parties, the District Court in Wisconsin remanded the Wisconsin Action back to the Dane County Circuit Court of the State of Wisconsin.  In light of the remand, on April 5, 2010, the Court denied the "First to File" Motion as moot since the suit was no longer in federal court, and ordered Cumis to file its answer within

twenty days after the Order.

On April 26, 2010, Cumis filed its answer and simultaneously filed a second Motion to Dismiss or Stay based on abstention grounds.  In response, Sperry cross-moved to amend the Complaint, adding two additional claims for breach of contract and bad faith.  The Court granted Sperry's motion to amend the Complaint, and denied without prejudice Cumis's Motion to Dismiss or Stay.

**The Present Action**

Sperry filed an Amended Complaint with this Court on August 6, 2010, for breach of contract, bad faith, and declaratory relief, in connection with the sale of real estate loans issued to its members, to the secondary market ("the Losses"), which Sperry contends fall within the coverage provided under the Bond.[1]  Sperry asserts that by Cumis's failure to pay Sperry for its losses, Cumis breached its contract with Sperry and by its conduct in breaching the contract as well as its conduct post loss, that Cumis acted in bad faith.

The matter pending before the Court concerns Sperry's Motion for Partial Summary Judgment and Cumis's Motion for Summary Judgment or in the alternative, Partial Summary Judgment.  Sperry moves for partial summary judgment as to the first count of its Amended Complaint, for Declaratory relief under Coverage Part A of the Bond, declaring that Cumis is under a duty to indemnify Sperry for any Losses resulting directly from acts committed by CUN,

---

[1]     Sperry's Amended Complaint sets forth four counts:  1) Declaratory relief under Coverage Part A of the Bond, that CUMIS is under a duty to indemnify Sperry for any Losses resulting directly from acts committed by CUN, USM and or any partner, officer or employee of those entities, while acting as "employees" of Sperry subject to the terms of the Bond; 2) Declaratory relief under Coverage Part S of the Bond, that CUMIS is under a duty to indemnify Sperry for any Losses resulting directly from acts of forgery committed by CUN, USM and any partner, officer or employee of those entities; 3) Damages for Breach of Contract for refusal to pay for covered losses; and 4) Damages for Bad-Faith for refusal to pay for covered losses, and intentionally misleading Sperry when the parties entered into a tolling agreement in September 2009 and concealing a related action in the state of Wisconsin.

USM and or any partner, officer or employee of those entities, while acting as "employees" of Sperry subject to the terms of the Bond.  Sperry concurrently strikes its second cause of action for declaratory relief under Coverage Part S of the bond, because its discovery proceedings in the separate but related FNMA Action revealed that the material reviewed was limited and does not support a conclusive finding of forgery.

Cumis moves for summary judgment, or alternatively for partial summary judgment, dismissing Sperry's four causes of action for judgment as a matter of law, and dismissing the action in the entirety, with prejudice.

## II.  DISCUSSION

### A.  Choice of Law

A federal court exercising diversity jurisdiction should apply the choice-of-law rules of the forum state.  Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Schwaber v. Hartford Accident & Indem., Co., 2007 U.S. Dist. LEXIS 94197 (D. Md. Dec. 17, 2007).  New Jersey's choice-of-law analysis provides that a fidelity bond is governed by the law of the state in which the insured risk is located.  See NL Indust. V. Commercial Union Ins. Cos., 1996 U.S. Dist. LEXIS 22852 (D.N.J. June 11, 1996); State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28 (N.J. 1980); see also Restatement (Second) of Conflict of Law §193; Century Indem. Co. v. Mine Safety Appliances Co., 942 A.2d 95, 104 (N.J. Super. Ct. App. Div. 2008).  Here, Sperry's principal place of business is Garden City Park, New York.  Therefore, under New Jersey's choice of law analysis, New York law applies to the issues presented in this matter.

### B.  Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Under Fed. R. Civ. P. 56(c), a party asserting that a fact cannot be or is genuinely disputed must support the assertion by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  The court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

In contract actions, summary judgment is appropriate only where the language of the relevant agreement is unambiguous.  If a contract is clear on its face, its proper construction is a

8

matter of law.  U.S. Naval Inst. v. Charter Commc's Inc., 875 F.2d 1044 (2d Cir. 1989).

Unambiguous provisions of insurance policies, "as with any written contract, must be accorded

their plain and ordinary meaning."  2619 Realty, LLC v. Fidelity and Guaranty Ins. Co., 303

A.D.2d 299, 300 (2003).  Here, the parties agree that the terms of the Bond are clear and

unambiguous and should be given their plain meaning. (Pl. MSJ Br. 6; Def. MSJ Br. 14).

### C.  The Terms of the Bond

Coverage Part A [Employee or Director Dishonesty] of the Bond provides:

> We will pay you for your loss resulting directly from dishonest
> acts committed by an "employee" or "director," acting alone or in
> collusion with others.
>
> Such dishonest acts must be committed by the "employee" or
> "director" with the intent to:
>
> a.  Cause you to sustain such loss; or
> b.  Obtain an improper financial benefit for the "employee,"
>     "director," or for any other person or entity.
>
> However, if some or all of your loss resulted directly or indirectly
> from a "loan" or "trade," that portion of the loss is not covered
> unless you establish that the portion of the loss involving a "loan"
> or "trade" resulted directly from dishonest acts committed by the
> "employee" or "director," acting alone or in collusion with others,
> with the intent to:
>
> 1)  Cause you to sustain such loss; and
> 2)  Obtain an improper financial benefit for the "employee" or
>     "director," or a financial benefit for any other person or entity.
>
> As used in this coverage, an improper financial benefit does not
> include any employment benefits received in the course of
> employment including salaries, commission, fees, bonuses,
> promotions, awards, profit sharing, business entertainment or
> pensions.
>
> (Bond 500 02/07, "Credit Union Bond Coverage," 1 (hereinafter "Bond"); Pl.
> MSJ. Br. Ex. B; Def. MSJ. Br. Ex R, at 286).

9

The Bond defines the term "Employee" as:

1. "Employee" means persons who were, are, or may be in the future, acting under your immediate direction and control in the conduct of your business and while in the course or scope of performance of their assigned duties; and
   . . .

3. For purposes of Employee or Director Dishonesty Coverage only, "employee" also means:
   . . .
   c. Persons you authorize, or persons employed by a partnership or corporation you authorize, to perform services as a processor of your checks, drafts, share drafts, automated clearinghouse items, member bill payments or accounting records.  All persons employed by any partnership or corporation you authorize to perform such services, including its partners, officers and employees, will collectively be considered one "employee" for all purposes of this Bond, except for the Termination Or Limitation of Coverage For Employee Or Director Condition.  However, the following processors, and the persons employed by them, will not be considered "employees" under this Bond:

      1) Developers or modifiers of computer software programs; or
      2) A Federal Reserve Bank or a clearinghouse; or
      3) A credit card or debit card processor.
   …

   f. "Servicing Contractors."  All persons employed by any "servicing contractor," including its partners, officers and employees, will collectively be considered one "employee" for all purposes of this Bond, except for the Termination or Limitation Of Coverage For Employee Or Director Condition.

   (Bond 20-21).

The Bond defines the term "Servicing contractor" as:

[A]ny person or entity duly authorized by you to perform any of the following services and only while performing such services:

a. Collect and record payments on real estate mortgage or home improvement loans; or

10

      b.  Establish tax or insurance escrow accounts on real estate mortgage or home improvement loans, made, held or assigned by you; or

      c.  Manage real property owned by you or under your supervision and control.

"Servicing contractor" includes the partners, officers and employees of entities duly authorized by you to perform any of the above services.

(Bond 27-28).

In addition to defining coverage for an "employee," the Bond also defines "covered property" as:

[T]he following physical (not electronic) items in which you have a financial interest or held by you in any capacity:

      a.  Currency, coins, bank notes or Federal Reserve Notes; or

      b.  Checks, drafts or share drafts; or

      c.  Original mortgages, documents of title, evidences of debt, security agreements, money orders, certificates of deposit or "certificated securities"; or

      d.  Precious metals, jewelry, gemstones, tickets, stamps, or coupons.

(Bond 17).

Last, as a condition precedent to coverage under the Bond, the insured must send written notice of its loss at the earliest practicable moment after discovery; and 180 days after notice of the discovery of the loss, file a sworn proof of loss. (Bond 47).

**D. Sperry's Motion for Partial Summary Judgment**

Sperry moves for partial summary judgment as to the first count of its Amended Complaint, for Declaratory relief under Coverage Part A of the Bond, that Cumis is under a duty to indemnify Sperry for any Losses resulting directly from acts committed by CUN, USM and or any partner, officer or employee of those entities, while acting as "employees" of Sperry subject to the terms of the Bond.  In connection with this motion, Sperry submits evidence to the Court, including:

11

- A sampling of true and complete copies of cancelled checks received by a Sperry employee, evidencing that payments received by CUN were initially deposited in a CUN clearing account and subsequently deposited into a USM account for the benefit of FNMA (Pl. MSJ. Br. Clark Aff. ¶ 17; Pl. MSJ. Br. Clark Ex. F).
- True copies of unauthorized notes and assignments from Sperry to USM signed by McGrath who misrepresented himself as a representative of Sperry (Pl. MSJ. Br. Ex. U).
- True and complete copies of a sampling of records of electronic account transactions, maintained by Sperry in the usual course of business, evidencing that ACH mortgage payments made by Sperry borrowers were initially received by CUN, and then were received by USM. (Pl. MSJ. Br. Clark Aff. ¶ 18; Pl. MSJ. Br. Clark Ex. G).
- Copies of FNMA Purchase Advices indicating the dates the loans were purchased by FNMA from USM. (Pl. Opp. Br. Pagliughi Ex. E).
- Copies of Trial Balance Reports from CUN to Sperry showing that the loans that had been assigned to USM, and ultimately sold to FNMA, remained in the Sperry portfolio. (Pl. MSJ. Br. Ex. Y).

Plaintiff also submits an Affidavit by McGrath, who plead guilty to and was convicted of crimes related to the fraudulent loan sales.  McGrath's Affidavit provides insight as to how the fraud commenced and was sustained and concealed:

> [ . . . ]
> 6.  Beginning in or about 2004, I and others at my direction began to sell loans held in credit union servicing portfolios, including Sperry's servicing portfolio, into the secondary mortgage market without the authorization of the credit unions.
> 7.  CU National, at my direction, engaged in this conduct while solely acting as servicer of the loans.
> 8.  Sperry had not consented to the sale of these unauthorized loans, and CU National (at my direction) falsely represented to Sperry that the loans remained in their servicing portfolio and continued to be serviced by CU National as provided for in the service agreement.
> 9.  CU National, at my direction, engaged in this conduct as a servicer which allowed CU National to continue to make the unauthorized loan sales without being discovered by Sperry.
> 10. I was never authorized by Sperry to sell these unauthorized loans and purposely concealed the unauthorized sales by, in part, continuing to service the loans.
> 11. To my knowledge, it appeared to Sperry that the unauthorized loans at all times remained in the Sperry

> Portfolio and were continuously being serviced by CU
> National when in fact the loans had actually been sold
> into the secondary market.

(Pl. MSJ. Br. Ex. T).

Sperry argues that the Coverage Part A of the Bond, <u>supra</u> at 9, applies here for loss resulting from dishonest acts of an employee.  Issues presented before the Court on Sperry's Motion for Partial Summary Judgment are whether the actors and actions are covered within the "Employee" definition of the Bond; whether a direct loss ensued; and whether the requisite intent is established under Coverage Part A of the Bond.

### 1.   *McGrath and CUN are "employees" within the terms of the Bond*

Sperry maintains that both CUN and McGrath operated as employees under the "Servicing Contractor" definition of the Bond, <u>supra</u> at 10-11, which reads in pertinent part: "[A]ny person or entity duly authorized by you to perform any of the following services and only <u>while performing</u> such services: a. Collect and record payments on real estate mortgage or home improvement loans; b.  Establish tax or insurance escrow accounts on real estate mortgage or home improvement loans, made, held or assigned by you" (emphasis added).  Sperry argues that because "CU National was engaged in the (servicing) collecting and recording of payments of the loans when the Mortgages were stolen, CU National, and therefore, McGrath as an officer and employee of CU National are 'employees' under the Bond's servicing contractor definition." (Pl. MSJ. Br. 17-18).  Sperry further argues that "once the loans were stolen, CU National continued to collect payments on behalf of Sperry but diverted those funds to a Fannie Mae clearing account and falsely recorded those payments on Sperry's reports." (Pl. Opp. Br. 5).

Cumis, however, argues that because "the Bond does not include the selling of loans to secondary investors in its definition of 'servicing contractor[]' . . . that contractor is not an

13

'employee' under the Bond while performing services related to those sales.  That point is clear."
(Def. Opp. Br. 15).  Cumis argues for a narrow construction of the "Servicing Contractor"
definition, that because the fraud was not perpetrated <u>while performing</u> the services, McGrath
and Cumis do not fall within the definition of an "Employee," and thus no coverage is afforded.
Cumis heavily relies on only one case, which is not controlling when applying New York choice
of law, <u>North Jersey Savings & Loan Ass'n v. Fidelity & Deposit Co. of Maryland</u>, 283 N.J.
Super. 56 (1993).  Cumis claims that as the "only decision on record addressing the 'servicing
contractor' issue present here, it provides strong guidance for this court and should be followed.
This is especially true as the <u>North Jersey</u> court did nothing more than interpret the Bond
language based on its plain meaning."  (Def. Opp. Br. 16-17).

        Although the Court is not controlled by <u>North Jersey</u>, the case is illustrative to some
degree, as the bond language and underlying facts are comparable, although not identical.
Nonetheless, <u>North Jersey</u> is distinguishable from the case here on two counts:  1) the relatedness
of the fraud to the collecting and recording of payments covered by the terms of the Bond; and 2)
the presence of manifest intent required as a matter of law, to cause a loss to the insured and to
obtain a financial benefit.  In <u>North Jersey</u>, a third party contractor, Landbank Equity
Corporation, purchased ten-million dollars worth of first and second mortgage loans from the
plaintiff-investor, North Jersey Savings & Loan Association.  In exchange, Landbank promised
to pay the investor a commitment fee of 1.5 percent, a fixed-rate income stream of 13.75 percent,
and to provide Landbank-originated privately-insured mortgages.  Additionally, Landbank
guaranteed to continue principal and interest payments for any loans if they became delinquent,
until such time as the loan became current or paid in full.

        Impropriety was found in the Landbank-originated mortgages which were used to

securitize consideration for the sale,[2] rather than in the Bond-covered function of collecting and recording.  The Superior Court of New Jersey reasons that the allegations of fraud and dishonesty regarding: inflated appraisals of Landbank-originated mortgages; insider loans designed to disguise its own speculative ventures; violations of state and federal statutes in obtaining the Landbank-originated loans; failure to notify North Jersey of foreclosures by other lienors on mortgaged property; and concealing the fact that the insurance policies were worthless, "relate to Landbank's conduct as originator and packager of the mortgages, as distinguished from its conduct as a servicing contractor." Id. at 72.

Implicitly, the Superior Court of New Jersey suggests that Landbank acted as a servicing contractor in the alleged conduct of making false returns on monies purportedly collected for North Jersey, and failing to remit those amounts.[3]  However, the record in North Jersey does not give further detail as to alleged impropriety related to the collecting and recording function, as in the case at-hand where fraud on the accounts was integral in the origination, perpetuation, and concealment of the general scheme.  Thus although it may have been reasonable for North Jersey to deem the function of collecting and recording to be distinct from the role of originator or packager based on the facts therein, in the case at-hand the Bond-covered function was central to the overall scheme of illegally assigning and selling the mortgages, and covering up the fraud.

Moreover, the North Jersey court goes on to reason that even if Landbank made

---

[2] Shortly after Landbank filed in bankruptcy, a number of class action suits were filed by its mortgage-borrowers, claiming that Landbank-originated mortgages were unenforceable due to violations of various federal and state laws.  As a result, "extensive civil and criminal litigation took place in several jurisdictions, culminating, in part, with the imprisonment of Landbank's officers and attorney."

[3] "With the exception of making false returns on monies purportedly collected for North Jersey and failing to remit those amounts, these allegations of fraud and dishonesty relate to Landbank's conduct as originator and packager of the mortgages, as distinguished from its conduct as a servicing contractor." Id. at 72 (emphasis added).

15

representations when it failed to service in accordance with good practices, and therefore the dishonest or fraudulent acts would be covered by the bond, the issue still remains whether the conduct was committed with manifest intent to obtain a financial benefit for itself "other than salaries, commissions, fees, bonuses or other employee benefits earned in the normal course of its employment," as is required under the bond. Id. at 74. Specifically, the Superior Court found that because Landbank only profited from the difference in the interest rate from mortgage payments from its borrowers (18 percent) and the interest rate it agreed to pay North Jersey (13.75 percent), plus the fee from North Jersey for servicing the loans, "Landbank merely gained the benefit it already contracted to receive," and therefore the required manifest intent element to cause loss and gain a financial benefit was missing. Id. at 76. Thus, North Jersey again departs from the case at-hand where CUN/USM clearly profited from the illegal sale of the Serviced Mortgages, as the proceeds were not remitted to Sperry.

Cumis contends that "[u]nder Sperry's reading, a third party contractor who collects and records the borrower's monthly payments on behalf of the insured is an employee for all purposes, and any dishonest acts committed by that contractor – even if wholly unrelated to loan processing – are covered." (Def. Opp. Br. 16). Cumis expounds a rather convoluted argument:

> While Sperry claims that CU National is somehow 'linked' to the transfer of the paper to US Mortgage which allowed the fraudulent sales to take place, and sent out fraudulent servicing reports (neither allegation is true), this would not change the fact that the fraud occurred when US Mortgage, acting in its capacity as the seller of Sperry loans on the secondary market, sold loans that were not designated for sale. Under no theory could US Mortgage be found to be in the act of 'servicing' Sperry's loans when US Mortgage "sold" the subject loans. Conversely, even if Sperry's allegations that CU National assisted in transferring the loan papers to US Mortgage or creating fraudulent reports were accurate, that would not change the fact that at the time CU National supposedly committing these wrongful acts, it was not actually performing loan servicing functions for Sperry.

16

(Def. MSJ. Br. 21).

Attached to this contention, Cumis submits the following in footnote: "[I]f the evidence showed that US Mortgage/CU National sent out false reports (which it does not), then US Mortgage/CU National would not have been servicing the Sperry loans when it sent out these false reports because under this scenario, Sperry would no longer have owned the loans at issue." Id.

Cumis's argument is unavailing because it ignores that the dishonesty was within the scope of a performed duty:  but for the covered activity of collecting and recording loans, the fraud could not have been originated, perpetrated, nor concealed.  This is clear based on an examination of McGrath's Affidavit which attests that  CUN "falsely represented to Sperry that the loans remained in their servicing portfolio and continued to be serviced by CU National as provided for in the service agreement[;  CUN] [ ] engaged in this conduct as a servicer which allowed CU National to continue to make the unauthorized loan sales without being discovered by Sperry[;] [ ] I was never authorized by Sperry to sell these unauthorized loans and purposely concealed the unauthorized sales by, in part, continuing to service the loans[;] [ ] To my knowledge, it appeared to Sperry that the unauthorized loans at all times remained in the Sperry Portfolio and were continuously being serviced by CU National when in fact the loans had actually been sold into the secondary market." (McGrath Aff., supra at 12).   Based on the record as a whole, there is no genuine dispute as to material fact that CUN failed to deposit the sales proceeds from FNMA into Sperry's account; continued to collect borrowers' payments on the unauthorized mortgages; diverted borrowers' payments into the FNMA account; failed to record the sale of the loan into the trial balance reports; and continued to report regularly monthly mortgage payments in the trial balance reports which had already been sold on the secondary market.  Cumis points to statements of CUN and Sperry employees who admit that they were not

17

aware of any false trial balance reports submitted to Sperry.  Cumis further attempts to disconnect McGrath's actions from CUN, casting him as only a seller of the mortgages under the auspices of USM.  However, the lack of knowledge of the witnesses, and the attenuated argument of McGrath's involvement, is futile since the hard evidence of cancelled checks, unauthorized notes and assignments, electronic account transactions, and FNMA purchase advices, bulleted above, in addition to McGrath's testimony, clearly indicate that the Bond-covered activity of collecting and recording was integral to the origination, perpetuation, and concealment of the fraudulent scheme.

In addition to disputing coverage related to the definition of "employee" under the "Servicing Contractor" definition under the Bond, the parties dispute coverage under the general "employee" definition set forth in subpart 3(c), supra at 10.  Specifically, Sperry submits that coverage applies because of CUN qualifies as an "employee" in its role as a processor of borrowers' checks; processor of clearinghouse items (i.e., the electronic processing of payments through the ACH system); and processor of accounting records (i.e., records of payments and balances such as the trial balance reports).  (Pl. MSJ. Br. 21-23).  Cumis counters that Sperry's argument is unavailing because Sperry is precluded from asserting this new claim for the first time in its summary judgment motion, and because the new theory is precluded by the rules of contract interpretation.  Cumis argues that by adopting Sperry's new "processor" argument, the Court would be ignoring and failing to apply the more specific "servicing contractor" provision of the Bond.  Because the Court has already found coverage under the Bond under the more specific "servicing contractor" definition, it need not reach a conclusion of coverage under the general "employee" definition.

**2. *McGrath and CUN's dishonest acts were committed with intent to cause Sperry's loss or obtain an improper financial benefit, and are thus covered under the Bond.***

Coverage Part A of the Bond, outlined <u>supra</u> at 9, covers "loss resulting directly from dishonest acts committed by an 'employee,' or 'director,' acting alone or in collusion with others."

> Such dishonest acts must be committed by the 'employee' or 'director' with the intent to:
>
> a. Cause you to sustain such loss; or
> b. Obtain an improper financial benefit for the 'employee,' 'director,' or for any other person or entity.

Sperry argues that it incurred loss at the moment that it lost its status as an obligee/mortgagee, when notes from the Sperry portfolio were transferred without authorization to USM.  Under the New York UCC Section 3-104, a note is a negotiable instrument, and therefore has value.  Loss in a fidelity crime bond means "the deprivation or dispossession of money or property of [the insured] due to the dishonest, criminal or fraudulent acts" of the insured's employees.  <u>Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc.</u>, 249 F. Supp. 2d 19, 27 (D. Mass 2003) (<u>citing</u> <u>Fitchburg Sav. Bank v. Massachusetts Bonding & Ins. Co.</u>, 274 Mass. 135 (Mass. 1931)).

In turn, Cumis first argues that Sperry cannot recover under the Bond because it has not established a loss of ownership due to McGrath's actions.  Cumis relies on Sperry's pleadings in the FNMA Action, which dispute FNMA's ownership due to the unauthorized and thus ineffective transfer of the loans.  Cumis adds a second contention in its opposition brief, arguing that any purported loss results from the FNMA Action settlement, which is indirect, and thus not a direct loss under the Bond.  However, the two cases Cumis references relate to losses from settlement proceedings brought by a third party, rather than direct loss to the employer based on the underlying actions, as is the case here.  For example, in <u>Aenta Cas. & Sur. Co. v. Kidder,</u>

Peabody & Co., 246 A.D.2d 202 (N.Y. App. Div. 1st Dept. 1998), the employer's loss was a result of settlement proceedings, rather than the underlying dishonest action of insider trading which caused pricing irregularities in the stock, which in turn caused a loss to customers, which then led to the litigation concluding in the settlement. Cumis's second case is similarly distinguishable, where in Vons Companies, Inc. v. Federal Ins. Co., 212 F.3d 489 (9th Cir. 2000), the federal appeals court held that the bond did not cover loss from settlement claims brought by third parties under the theory of vicarious liability. Here, CUN's fraudulent theft of the notes caused the employer's direct loss. Thus, the subsequent settlement reached in the FNMA Action is viewed as a mitigating factor rather than an extenuating factor of loss.

Under the terms of the Bond, intent must be shown for the loss sustained or an improper financial benefit obtained. Cumis contends that the question of McGrath's "manifest intent" is one for a jury to decide, reasoning that "the fact that US Mortgage continued to make monthly payments to Sperry on the loans that it purported to 'sell' to Fannie Mae, and given the fact that US Mortgage never recorded Fannie Mae's interest in the loans, the evidence is simply insufficient to establish that McGrath and his co-conspirators subjectively intended to cause Sperry, rather than Fannie Mae, a loss." (Def. Opp. Br. 36). However, intent to cause loss or improper financial gain could not be clearer given the undisputed facts: loans were removed without authorization from the Sperry account; loans were subsequently illegally sold on the secondary market; and sale proceeds were not remitted into the Sperry account. Moreover, the continued collection of borrowers' payments on the unauthorized Mortgages were diverted to FNMA rather than remitted to Sperry in order to conceal the theft and sale of the Subject Mortgages. Taking into consideration the undisputed facts and the surrounding circumstances bearing upon the employee's purpose (see Fed. Deposit Ins. Corp., as Receiver v. National

20

Union Fire Insurance Company, 205 F.3d 66, 71-75 (2d. Cir. 2000)), we find that Cumis has

failed to offer specific facts that establish a material dispute, rather than simply attempt to create

"some metaphysical doubt as to material fact" (see Matsushita Elec. Indus. Co., Ltd., 475 U.S. at

586-87), to avoid summary judgment as to a finding of intent to cause loss and/or improper gain.

### E.  Cumis's Motion for Summary Judgment or Partial Summary Judgment

In light of the foregoing, Cumis's motion for summary judgment on Counts 1 and 3 must

be denied.  Sperry has withdrawn Count 2 based on forgery.  There remains Cumis's motion for

summary judgment in its favor for Sperry's Count 4 bad faith claim.  The seminal case, Sukup v.

State, 19 N.Y.2d 519, 522 (N.Y. 1967), establishes the standard for finding "extra-contractual"

liability under an insurance contract holding a finding of bad faith:

> It would require more than an arguable difference of opinion
> between carrier and insured over coverage to impose an extra-
> contractual liability for legal expenses in a controversy of this
> kind.  It would require a showing of such bad faith in denying
> coverage that no reasonable carrier would, under the given facts,
> be expected to assert it.

The record would need show a "gross disregard for its policy obligation" rather than "merely an

arguable case in which the carrier was held wrong."  Id.

Sperry persuasively defends its bad-faith claim, listing a series of episodes: 1) Cumis's

consistent argument against coverage because the sale was outside the bounds of the servicing

activity; 2) Cumis's strained argument that McGrath/CUN was not an employee under the

"Servicing contractor" definition; 3) Cumis's assertion that reports reflect that loans remained in

the Sperry portfolio and were not fraudulently stolen, even though they had been assigned to

USM;  4) Cumis's position that there was no direct loss due to subsequent settlement in the

FNMA Action.  There is enough to create a factual issue with respect to the Count 4 bad faith

claim and preclude summary judgment in Cumis's favor on that claim.

21

## III.  CONCLUSION

For the foregoing reasons, Sperry's Motion for Summary Judgment is GRANTED, and Cumis's Motion for Summary Judgment or in the alternative Partial Summary Judgment is DENIED.  Sperry is requested to submit a proposed order incorporating the foregoing determinations.  It should attempt to secure Cumis's approval of the form before submitting it.

/s/Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: March _1__, 2012